1
2
3
4
5
6
7

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GARY ANDRE LACY, | 1:07-cv-00381-LJO-EPG-PC |
| Plaintiff, | FINDINGS AND RECOMMENDATIONS TO GRANT IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (ECF No. 121.) |
| vs. | |
| H. TYSON, et al., | OBJECTIONS, IF ANY, DUE WITHIN THIRTY DAYS |
| Defendants. | |

## I.    BACKGROUND

Gary Andre Lacy ("Plaintiff") is a former state prisoner proceeding *pro se* with this civil rights action pursuant to 42 U.S.C. § 1983.  Plaintiff filed the Complaint commencing this action on March 9, 2007.  (ECF No. 1.)  This action now proceeds on the Second Amended Complaint, filed on April 28, 2009, against defendants Correctional Officer (C/O) T. Reyna, C/O N. Correa, Sergeant M. Bremnar, Sergeant M. Brookwalter, Captain H. Tyson, Sergeant J. Peacock, Medical Technical Assistant (MTA) Aspeitia-Fleming, and Doctor I. Patel, (collectively, "Defendants") on Plaintiff's claims for excessive force, failure to protect, and

deliberate indifference to serious medical needs, based on events beginning on January 27, 2006.[1]  (ECF No. 16.)

On June 29, 2012, Defendants filed a motion for summary judgment.[2]  (ECF No. 121.) On November 8, 2012, Plaintiff filed an opposition to the motion.[3]  (ECF Nos. 135-137.)   On December 10, 2012, Defendants filed a reply.  (ECF No. 144.)

Defendants' motion for summary judgment is now before the Court.  Local Rule 230(*l*). For the reasons that follow, the Court recommends that Defendants' motion be granted in part and denied in part.

## II.   SUMMARY JUDGMENT STANDARD

Any party may move for summary judgment, and the Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a) (quotation marks omitted); Washington Mutual Inc. v. U.S., 636 F.3d 1207, 1216 (9th Cir. 2011).  Each party's position, whether it be that a fact is disputed or undisputed, must be supported by (1) citing to particular parts of materials in the record, including but not limited to depositions, documents, declarations, or discovery; or (2) showing that the materials cited do not establish the presence or absence of a genuine dispute or that the opposing party cannot produce admissible evidence to support the fact.  Fed. R. Civ. P. 56(c)(1) (quotation marks omitted).  The Court may consider other materials in the record not cited to by the parties, but it is not required to do so. Fed. R. Civ. P. 56(c)(3); Carmen v. San Francisco Unified School Dist., 237 F.3d 1026, 1031 (9th Cir. 2001); accord Simmons v. Navajo County, Ariz., 609 F.3d 1011, 1017 (9th Cir. 2010).

Defendants do not bear the burden of proof at trial and in moving for summary

---

[1] Defendants Dill and Heanacho were dismissed by the Court on August 27, 2009.  (ECF No. 17.) Plaintiff's claims for equal protection, and for retaliation against defendant Dill, were also dismissed by the Court, for failure to state a claim.  Id.  On November 5, 2012, the Court dismissed defendant R. Reyna from this action, with prejudice, due to notice of the defendant's death.  (ECF No. 132.)

[2] The motion is titled "Notice of Amended Motion and Motion for Summary Judgment."  (ECF No. 121.)  The original motion was filed on June 28, 2012.  (ECF No. 119.)

[3] On July 10, 2012, the Court issued and re-served Plaintiff with the summary judgment notice required by Rand v. Rowland, 154 F.3d 952 (9th Cir. 1998), and Klingele v. Eikenberry, 849 F.2d 409 (9th Cir. 1988).  (ECF No. 123.)  The notice was re-served in response to Woods v. Carey, 684 F.3d 934 (9th Cir. 2012).

judgment; they need only prove an absence of evidence to support Plaintiff's case.  In re Oracle Corp. Securities Litigation, 627 F.3d 376, 387 (9th Cir. 2010) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548 (1986)).  If Defendants meets their initial burden, the burden then shifts to Plaintiff "to designate specific facts demonstrating the existence of genuine issues for trial."  Id. (citing Celotex Corp., 477 U.S. at 323).  This requires Plaintiff to "show more than the mere existence of a scintilla of evidence."  Id. (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S.Ct. 2505 (1986)).

In judging the evidence at the summary judgment stage, the Court may not make credibility determinations or weigh conflicting evidence, Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007) (quotation marks and citation omitted), and it must draw all inferences in the light most favorable to the nonmoving party and determine whether a genuine issue of material fact precludes entry of judgment, Comite de Jornaleros de Redondo Beach v. City of Redondo Beach, 657 F.3d 936, 942 (9th Cir. 2011) (quotation marks and citation omitted), cert. denied, 132 S.Ct. 1566 (2012).  The Court determines only whether there is a genuine issue for trial and in doing so, it must liberally construe Plaintiff's filings because he is a *pro se* prisoner.  Thomas v. Ponder, 611 F.3d 1144, 1150 (9th Cir. 2010).

## III.   PLAINTIFF'S ALLEGATIONS IN THE COMPLAINT

The events at issue allegedly occurred at Kern Valley State Prison (KVSP) when Plaintiff was incarcerated there.  Plaintiff alleges the following facts.

On January 27, 2006, Officer R. Reyna (now deceased) approached Plaintiff during chow and demanded that Plaintiff leave his food at the table and exit the dining hall.  Once outside, R. Reyna cuffed Plaintiff and slammed his face into the brick wall several times.  R. Reyna then stated, "write this one up too[,]" referring to the fact that Plaintiff previously filed a complaint against R. Reyna for misconduct.  (2d Amd Cmp, ECF No. 16 at 3 ¶IV.)  R. Reyna twisted Plaintiff's hands and arms above his head, causing severe pain.  R. Reyna then escorted Plaintiff to the program office to be assaulted further by other officers.

Once Plaintiff was inside the program office, he was "shoved" inside the holding cage and strip searched.  R. Reyna and defendant Correa "twisted and jerked" Plaintiff's arms high

in the air, causing pain.  (Id.)  Plaintiff then told defendants Peacock, Bremnar, Brookwalter, and T. Reyna that he was just assaulted.  Defendant Tyson was notified of Plaintiff's allegation and, while defendant Tyson stood in the hallway "supervising," Plaintiff was slammed into the walls and to the ground by R. Reyna and defendants Peacock, Bremnar, Brookwalter, and T. Reyna.  (Id. at 4:21-23.)  Defendants Brookwalter, Bremnar, and defendant T. Reyna then dragged Plaintiff out of the holding cage by his hands and arms across the ground into the hallway where Plaintiff was hoisted into the air and carried across the yard.  R. Reyna and defendants Brookwalter, Bremnar, and T. Reyna dropped Plaintiff on his torso in front of housing unit #3.

While Plaintiff was on the ground, defendant Brookwalter twisted Plaintiff's shoulder and left arm back and upwards, as defendant Bremnar pinned Plaintiff's right arm against the concrete and R.  Reyna and defendant T. Reyna pressed their knees into Plaintiff's legs and lower back.  Defendant Brookwalter then ordered Plaintiff to stand while violently twisting Plaintiff's arm.  Defendant Bremnar lifted Plaintiff up and carried him to his housing unit where he was sent face first through the open hall window and punched in the ribs by R. Reyna. Plaintiff was then forced into his cell.

Plaintiff sought medical treatment, but defendants Tyson, Peacock, Brookwalter, Bremnar, and Aspeitia denied his requests.   Plaintiff's cellmate noticed Plaintiff's injuries and alerted prison officials.   Plaintiff was seen by Dr. Akanno [not a defendant] who determined Plaintiff needed x-rays and other treatment as a result of the assault.  Defendant MTA Aspeitia-Fleming told Plaintiff the reason she refused to provide Plaintiff with medical treatment was because he was a rat and lived on a protective custody yard.

On January 30, 2006, Plaintiff's mother began calling the KVSP ombudsman and Warden to find out why no incident or use of force reports were filed in connection with the January 27, 2006 incident.  Defendant Tyson then called Plaintiff into a meeting where Plaintiff told Tyson that he saw him in the hallway watching as he was being assaulted and asked Tyson why no investigation was taking place.  Defendant Tyson sent Plaintiff back to his cell.

\\\

On February 1, 2006, Plaintiff filed another staff complaint against R. Reyna and defendants T. Reyna, Heanacho, Correa, Tyson, Brookwalter, and Bremnar for the January 27 assaults.  Plaintiff was subsequently transferred to administrative segregation (Ad-Seg), where he unsuccessfully sought medical treatment for his injuries.  Plaintiff filed medical appeals, but defendant Patel refused to intervene or to ensure Plaintiff received appropriate treatment.

## IV.    PLAINTIFF'S CLAIMS

### A.    EXCESSIVE FORCE – DEFENDANTS CORREA, BROOKWALTER, BREMNAR, T. REYNA, AND PEACOCK

The Eighth Amendment prohibits those from operating our prisons from using "excessive physical force against inmates."  Farmer v. Brennan, 511 U.S. 825 (1994); Hoptowit v. Ray, 682 F.2d 1237, 1246, 1250 (9th Cir. 1982) (prison officials have "a duty to take reasonable steps to protect inmates from physical abuse"); see also Vaughan v. Ricketts, 859 F.2d 736, 741 (9th Cir. 1988), cert. denied, 490 U.S. 1012 (1989).  "Being violently assaulted in prison is simply not 'part of the penalty that criminal offenders pay for their offenses against society.'"  Farmer, 511 U.S. at 834.

Whenever prison officials are accused of using excessive physical force in violation of the Eighth Amendment's prohibition against cruel and unusual punishment, the core judicial inquiry is whether the force was applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.  Hudson v. McMillian, 503 U.S. 1, 6-7 (1992).  Force does not amount to a constitutional violation if it is applied in a good faith effort to restore discipline and not "maliciously and sadistically for the very purpose of causing harm."  Whitley v. Albers, 475 U.S. 312, 320-21 (1986); Clement v. Gomez, 298 F.3d 898, 903 (9th Cir. 2002).  Under the Eighth Amendment, the Court looks for malicious and sadistic force, not merely objectively unreasonable force.  Clement, 298 F.3d at 903.

In determining whether the constitutional line has been crossed, the Court may consider such factors as the need for the application of force, the relationship between the need and amount of force that was used, the extent of injury inflicted, the threat reasonably perceived by the responsible officials and any efforts made to temper the severity of a forceful response.

Hudson, 503 U.S. at 7.  Prison administrators should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.  Whitley, 475 U.S. at 322.

### 1.   Escort from Dining Hall to Program Office

Defendants argue that taking Plaintiff's account as believable, the discomfort felt by Plaintiff during the escort from the dining hall to the Program Office did not cause any observable injury, or violate Plaintiff's constitutional rights.   Defendants support their argument with Plaintiff's deposition and the declarations of defendants T. Reyna, Correa, and Tyson.

In his deposition, Plaintiff testifies:

> During the escort to the program office, while I was being further applied force on, the Defendant N. Correa arrived as well and assisted R. Reyna with bending and jerking my arms behind my back, which had me tilted over during the escort.

(Pltf.'s Depo. ("Depo.") 29:20-24.)

Regarding the escort, N. Correa declares:

> On January 27, 2006, I assisted Officer R. Reyna with escorting inmate Lacy from the dining hall to the Program Office on Facility C.  This escort was uneventful.  I observed Lacy at all times during the escort.  If anyone had twisted and jerked his hands and arms, I would have seen it.  No such conduct occurred.
>
> It is in accordance with CDCR procedure for an escorting officer to grasp an inmate's arms to maintain control of a handcuffed inmate during an escort.  The physical grasp is not a use-of-force under CDCR procedures.

(Correa Decl., ECF No. 121-5 ¶¶3-6.)

C/O T. Reyna declares:

> I observed R. Reyna escort Lacy to the Facility C Program Office with Officer Correa, and I followed them.  Neither Officer R. Reyna nor Officer Correa twisted or jerked Lacy's arms during the escort, and, Lacy did not complain of pain during the escort.

(T. Reyna Decl., ECF No. 121-9 ¶¶13-14.)

\\\

\\\

Captain Tyson declares:

> While I was at work on January 27, 2006, I do not independently recall where I was when Lacy was escorted from the dining hall to the Facility C Program Office, then to Building 3. I was likely at an executive staff meeting in the Warden's office, conducting classification committee in Ad-Seg 2, or in my office. In any event, I did not observe Lacy being escorted that morning. I did not participate in any escort on the morning of January 27, 2006.

(Tyson Decl., ECF No. 121-11 ¶¶ 12-14.)

Concerning Plaintiff's medical examination after the first escort, MTA Aspeitia-Fleming declares:

> On the morning of January 27, 2006, I examined Lacy in the Facility C Program Office. I examined Lacy at approximately 9:50 a.m., and noted that Lacey had an abrasion or scratch on his right temple. Lacey did not tell me the cause of this injury, did not complain of pain, or make any other statement to me. I cleared Lacy for placement in administrative segregation.

(Aspeitia-Fleming Decl., ECF No. 121-2 ¶¶ 7-10.)

## 2.   <u>Escort from Program Office to Section B Housing</u>

Defendants argue that according to Plaintiff's account of the escort from the Program Office holding cell to Section B Housing, defendants Brookwalter, Bremnar, and T. Reyna, and another officer lifted and held Plaintiff by his arms and legs because of the officers' need to transport Plaintiff to his cell so that the day's program could continue. Defendants support their argument with Plaintiff's deposition testimony.

Once at the Program Office, Plaintiff was placed in a holding cell. Plaintiff requested medical attention and received a medical evaluation approximately fifteen minutes after being placed in the holding cell. (Depo. 31:2-5.) Plaintiff testified that the following chain of events occurred after being placed in the holding cell:

> I would say maybe approximately another 15 minutes or so, Officer T. Reyna - excuse me - entered the room with another unidentified officer that I don't recall, I can't identify at the time, in the holding cell room. And at that time I was sitting down and they told me that to stand up, that I'm going back to my cell. And at that time, I explained to them that I was having severe headache, feeling dizzy, lightheaded, and I had just been assaulted by Officer R. Reyna and that I needed medical attention. And they left the room. And maybe about 30 seconds

later, defendant M. Brookwalter returned to the holding cell cage, opened the cage, told me to stand up, and proceeded to grab me, helping me stand up.  And then began to jerk me inside of the holding cell cage, bumping me up against the cage, and then snatched me out of the cage room, holding cell cage and further hit me up against the other cages and the wall towards the door of the holding cell room.

Then, I believe Officer T. Reyna and N. Bremnar, all who I can recall at that time, were all in the hallway.  And then they assisted bringing me out of the holding cell cage room with Brookwalter and grabbed me by both arms and my legs and proceeded to carry me out of the holding cell cage room and the program office hallway.

No, may I back up?  Prior to –

Sure.

Prior to T. Reyna coming into the holding cell cage room to tell me to leave, I can see through the holding cell cage room door that defendant H. Tyson was right outside of the door in the hallway with the other officers.  Now, right when I – after I seen him, I seen T. Reyna come in and then T. Reyna left after I told him – after requested medical attention.  And then Brookwalter came in and everything proceeded from there as far as use of force.  And then they carried me out of the program office and carried me across the yard.  And while I was being carried at that time, I seen other inmates all on the patio in front of the laundry and in front of medical towards the right of the program office door.  They was ordered to get out of the way while I was being carried across the yard.  And once I was carried across the yard, directly across the yard this time, not on the walk pathway, I was dropped.  Mr. Brookwalter ordered officers that was carrying me, which I identified as M. Bremnar, holding my right arm, Brookwalter holding my left arm, and T. Reyna holding my leg, and another officer who I really couldn't identify holding another leg, they was ordered to drop me right on the walkway once I was in front of Three Building.  And right as I hit the ground on my front -- on my chest, my upper torso, my front torso, I heard M. Brookwalter.  Well, once I heard M. Brookwalter tell them to drop me right there, I felt, you know, M. Bremnar hold my right arm towards the concrete and my legs was being held on the concrete.  And then M. Brookwalter proceeded to twist my left arm behind my back telling me using, you know, vulgar orders to stand, which I stated in my facts, to stand my bitch ass up and walk or he's going to break my left arm.  And once he said that, M. Bremnar told me that he'd kill me.

Now, at that time I really couldn't respond.  But I managed after a while, as M. Brookwalter continued to bend my left – twist my left arm behind my back towards the back of my head, I proceeded to tell them that – I responded to him and told him I really couldn't walk.  I couldn't walk because I needed medical attention.  So I was picked back up by the officers who was carrying me, which I identified as M. Bremnar and Brookwalter

and T. Reyna at the time, and I was carried back towards Three Building.  Once I arrived in the Three Building rotunda, I was pushed up against the entrance of C section of facility – Building Three rotunda, which is like a glass window on the side of the entrance door of C section.  And I was pushed up against there by these officers.  And as I tried to turn towards – turn my head towards the right just to identify as best as I could who was around me, I identified R. Reyna at that time.  And he pushed my head back towards the front and told me, "Don't look" – he told me don't look at him and, you know, started using vulgar expressions towards me.  And then I heard M. Brookwalter tell at the time, which was officer – an officer in the tower to open up B section where my housing was.  And once she opened up B section, I was carried again from that point by all four of my arms and my legs up into B section and up the stairs to the top, to the second tier.  And in front of my cell I was stood upright again.

And at that time they told my cellmate, who was at that time – who I have declaration from – Mando Sanders was my cellmate.  They told him to get to the back of the cell.  And once he complied and went to the back of the cell, my cell door was opened and I was thrown in the cell.

And once I was thrown in the cell, I fell face-forward on the cell inside of the cell on the ground.  And once they threw me in and closed the door and left the section my cellmate at that time began to request medical attention for me by hitting on the door calling, "Man down, we need medical attention in cell 220."  And additional inmates began to assist him with requesting medical attention for me.

(Depo. 39:1-43:4.)

Plaintiff described his injuries from the events of January 27, 2006:

Well, I received bruises to my face, bruises on my back.  I received headaches, dizziness, shoulder injury, loss of mobility in my arm, and my constant continued treatment in my hand and my arm where I had to receive physical therapy for the whole while I was at Kern Valley.  I received maybe three sets of x-rays, which I was told was coming back negative.

(Depo. 86:12-19.)

MTA Aspeitia-Fleming testified about her second examination of Plaintiff which took place at 11:00 a.m. on January 27, 2006:

I examined Lacy a second time at 11:00 a.m. that morning, when Officer Singleton escorted him to the medical clinic.  I documented my examination of Lacy on a 7219 form.  A true copy of this form is attached as Exhibit D.  The 7219 form does not indicate, and I do not recall, where I examined him.  During the examination, I observed the same scratch to Plaintiff's right temple or eye, but no other injuries.  Lacy told me during the

9

examination that "[he] got [his] arm twisted" by staff. I examined Lacy's arms and found no evidence of any injury consistent with forceful twisting. Because Lacy made allegations against staff, and complained of pain, I referred Lacy for further examination to a registered nurse. However, Lacy's non-serious injuries did not preclude him from returning to his cell in administrative segregation after the examination.

(Aspeitia-Fleming Decl., ECF No. 121-2 ¶¶11-16 & Exh. D.)

### 3. <u>Discussion</u>

The Court finds that Defendants have met their burden regarding the escort from the dining hall to the Program Office and placement into the holding cage. Plaintiff's testimony establishes that the escort to the program office was conducted by R. Reyna. Plaintiff testifies in his deposition that he followed R. Reyna's orders but was assaulted. Specifically, Plaintiff testifies that "[t]he officer ordered me to set my meal on the table and step outside the dining hall. When I followed those orders and stepped outside the dining hall, I was ordered to stand and face the wall. And when I stood and faced the wall he ordered me to put my hands behind my back. And when I did that, he cuffed me up and proceeded to hit my head up against the wall and then proceeded to assault me further, which I allege in my facts." (Dep. 23:17-25.) As noted, however, defendant R. Reyna was dismissed from this action because he passed away.

Plaintiff testifies in his deposition that "defendant N. Correa arrived as well and assisted R. Reyna with bending and jerking my arms behind my back, which had me tilted over during the escort." (Depo. 29:20-24.) To the extent that defendant Correa grasped Plaintiff's wrists and elbow in order to maintain control of Plaintiff, such force does not subject him to liability. With respect to any of the remaining Defendants, Plaintiff's testimony fails to establish any evidence that excessive force was used during the escort to the program office.

Defendants do not, however, meet their burden regarding the transport of Plaintiff from the holding cage to section B housing. Although Sgt. Peacock's declaration establishes that Plaintiff was "lowered to the ground" in front of the housing unit, Defendants' evidence establishes that Plaintiff was deliberately dropped on his face and chest by defendants Bremnar, Brookwalter, and T. Reyna. Plaintiff alleges that he was dropped, and indicates in his

deposition that he was dropped from a horizontal position.

> Q.   So now we've got Brookwalter on your left arm, Bremnar on your right.  Brookwalter gives an order to T. Reyna and another officer; one to grab each leg, correct?
>
> A.   Yes.
>
> Q.   And you recall that T. Reyna – I think you said he had your left leg, if I recall, but I'm not sure of that.  Do you remember which leg T. Reyna had?
>
> A.   Not at that point.  Not at that point.
>
> Q.   But T. Reyna's got a leg and then you're lifted up and now you're in the horizontal position?
>
> A.   Yes.

(Depo. 52:21-53:6.)

> Once I -- they carried me across the yard, Brookwalter ordered them to drop me directly in front once we reached the track area, concrete track area.  Once we got off the grass area of the yard and hit the track area right in front of the entrance door of Housing Unit Three, Brookwalter gave an order out loud to drop my bitch ass right in front of Housing Unit Three.  Once they dropped me, they continued to apply excessive force at that time by holding my body on the concrete, and Brookwalter began to twist my left arm and shoulder behind my back.  And at that time he gave me an order to stand my bitch ass up or he is going to break my left arm and my left shoulder.

(Depo. 55:19-56:6.)

> And right as I hit the ground on my front – on my chest, my upper torso, my front torso, I heard M. Brookwalter.  Well once I heard M. Brookwalter tell them to drop me right there, I felt, you know.  M. Bremner hold my right arm towards the concrete and my legs was being held on the concrete.   And then M. Brookwalter proceeded to twist my left arm behind my back telling me using, you know, vulgar orders to stand, which I stated in my facts, to stand my bitch ass up and walk now or he's going to break my left arm.  And once he said that M. Bremner told me that he's kill me.

(Depo. 41:1-13.)

As noted above, the evidence for the opposing party is to be believed, <u>Anderson</u>, 477 U.S. at 255, and all reasonable inferences that may be drawn from the facts placed before the Court must be drawn in favor of the opposing party, <u>Matsushita Elec. Indus. Co, Ltd. V. Zenith Radio Corp.</u>, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356 (1986) (citing <u>United States v. Diebold,</u>

Inc., 369 U.S. 654, 655 (1962)(per curiam)).  A reasonable inference can be drawn from Plaintiff's deposition that defendants Bremnar, Brookwalter, and T. Reyna dropped Plaintiff onto the ground from a horizontal position, and that they pushed Plaintiff into his cell, with Plaintiff falling "face forward on the cell inside of the cell on the ground."

> I heard M. Brookwalter tell at the time, which was officer – an officer in the tower to open up B Section where my housing was. And once she opened up B Section I was carried again from that point by all four of my arms and my legs up into B Section and up the stairs to the top, to the second tier.  And in front of my cell I was stood upright again.  And at that time they told my cellmate . . . to get to the back of the cell.  And once he complied and went to the back of the cell, my cell door was opened and I was thrown in the cell.  And once I was thrown in the cell, I fell face-forward on the cell inside of the cell on the ground.

(Depo. 42:10-24.)

Defendant Sgt. J. Peacock declared:

> I observed Sergeant Brookwalter order the escorting officers to lift Lacy and carry him back to his housing unit.  I saw the officers lift Lacy by his arms and legs and continue walking toward the housing unit.  Once in front of the housing unit, I saw the officers lower Lacy to the ground.  Sergeant Brookwalter ordered Lacy to walk into the building and return to his cell.  I observed Lacy comply with the order.

(Peacock Decl., ECF No. 121-8 ¶¶17-20.)

Defendant T. Reyna declared:

> I observed Lacy walk out of the program office and enter the patio area, under escort by Sergeant Brookwalter.  Lacy did not appear or behave as though he was injured.  I didn't drag Lacy out of the "holding cell room" by his hands and arms onto the patio area.  I did not observe anyone drag Lacy out of the holding cell by his hands and arms onto the patio area.  Once he reached the patio area, Lacy attempted to lie down on the ground, and ignored orders to stand up.  In response, I assisted Sergeant Brookwalter by taking hold of Lacy by the arms, lifting him, and carrying him to his housing unit.  Another officer helped to carry Lacy by lifting his legs during the escort.  Once outside Building 3, the other escorting staff and I lowered Lacy to the ground and ordered him to enter the unit and return to his cell.  I observed Lacy stand up and enter the housing unit without incident."

(T. Reyna Decl., ECF No. 121-9 ¶¶21-28.)

\\\

\\\

12

Defendant H. Tyson declared:

> While I was at work on January 27, 2006, I do not independently recall where I was when Lacy was escorted from the dining hall to the Facility C Program Office, and then to Building 3. I was likely at an executive staff meeting in the Warden's Office, conducting classification committee in Ad-Seg 2, or in my office. In any event, I did not observe Lacy being escorted that morning. I did not participate in any escort on the morning of January 27, 2006. I did not observe any custody staff assault Lacy, apply unnecessary force, or engage in any misconduct on January 27, 2006.

(Tyson Decl., ECF No. 121-11 ¶¶12-14.)

As for Sgt. Peacock, Defendants' evidence shows that Peacock only supervised the other officers during the transport and did not touch Plaintiff. In his deposition, Plaintiff testified that Sgt. Peacock did not use excessive force against Plaintiff up to the time when Plaintiff was given a medical examination by MTA Aspeitia-Fleming in the holding cell. (Depo. 33:21-38:12.)

> Q.   Well, going back to Peacock. Peacock, as I understand, when you were in the holding cage, he stepped into the room and you said you needed medical care. And later [Aspeitia-Fleming] arrived and then she left and they were leaving the room, you said you needed medical care again, and Peacock did not respond to you at all. Do I have the right officer on that one?
>
> A.   Yes.
>
> Q.   Other than that, Peacock never laid a hand on you?
>
> A.   No he didn't, but –
>
> Q.   In all of your description of everything that happened I never heard one word that Peacock ever touched you.
>
> A.   No, not that I recall. Not directly.
>
> Q.   So other than alleged [deliberate] indifference, Peacock didn't summon you medical care, is there any allegation against Peacock?
>
> A.   Other than him having supervisor liability and acting in concert because he was right there during the whole time, he's involved in excessive force too.
>
> Q.   Because he's a sergeant or supervisor?
>
> A.   Yes, he's a sergeant, and I believe he was acting lieutenant on that day.

(Depo. 74:6-75:4.)

///

Sergeant Peacock declared that he did not participate in the second escort.

> I did not touch Lacy, or participate in the escort of Lacy from the
> holding cell to Building 3 on January 27, 2006.

(Peacock Decl., ECF No. 121-8 ¶26.)

Defendants argue that the force used on Plaintiff did not result in injury significant enough to warrant relief.  The Prison Litigation Reform Act provides that "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental and emotional injury suffered while in custody without a prior showing of physical injury."  42 U.S.C. § 1997e(e). The physical injury "need not be significant but must be more than *de minimis*."  Oliver v. Keller, 289 F.3d 623, 627 (9th Cir. 2002).

However, the  relevant inquiry is not whether Plaintiff's injuries are *de minimis,* but whether the use of force was *de minimis*.  See Wilkins v. Gaddy, 559 U.S. 34, 37 (2010) ("Injury and force … are only imperfectly correlated, and it is the latter that ultimately counts.")  The degree of Plaintiff's injuries only serves as evidence of the degree of force used, it does not conclusively resolve the question of whether the degree of force was *de minimis*.  Id. ("The extent of injury may . . . provide some indication of the amount of force applied.") Defendants cannot escape liability for the use of force simply because Plaintiff failed to suffer any treatable injury.  "An inmate who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury."  Id.; Hudson, 503 U.S. at 9 ("In the excessive force context, society's expectations are different.  When prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency are always violated.  This is true whether or not significant injury is evident.") (internal citations omitted).  This case therefore turns on whether the force was used in a good faith effort to restore order or maintain discipline.  The extent of Plaintiff's injury will be a factor on determining whether the force used was excessive.  Plaintiff testified in his deposition about his injuries:

> Q.     In terms of injuries, what kind of injuries did you actually sustain
> from this excessive force on January 27, 2006?

///

> A.      Well, I received bruises to my face, bruises on my back. I
> received headaches, dizziness, shoulder injury, loss of mobility in
> my arm, and my constant continued treatment in my hand and my
> arm where I had to receive physical therapy for the whole while I
> was at Kern Valley.

(Dep. 86:9-23.)

As to defendants Correa and Peacock, the Court finds that they have met their burden on summary judgment for Plaintiff's claims of excessive force against them. The burden now shifts to Plaintiff to designate specific facts demonstrating the existence of genuine issues for trial on these claims.

Plaintiff offers no argument, or evidence, in his opposition that defendant Peacock exercised excessive force against him. In fact, Plaintiff testified in his deposition that Peacock's participation was limited to supervisory liability and the failure to protect Plaintiff from excessive force by others. (Dep. 74:6-75:4.)

With respect to defendant Correa, Plaintiff testified that "[d]uring the escort to the program office, while I was being further applied force – excessive force on, the defendant N. Correa arrived as well and assisted R. Reyna with bending and jerking my arms behind my back, which had me tilted over during the escort." (Dep. 29:20-25.) Plaintiff also testified that the actions of R. Reyna and Correa caused him injuries.

> R. Reyna then proceeded to escort me to the Facility-C Program
> Office.   During the escort, R. Reyna got assistance from
> Defendant N. Correa.   Both started jerking my arms upwards
> above my shoulders, causing me to involuntarily bend over at the
> waist.   As my arms were being violently jerked by Defendants
> Correa and R. Reyna, I felt a sharp painful twinge in my left
> shoulder, which caused me to scream out in pain.   After I
> screamed, both Correa and R. Reyna seemed to jerk my arms
> even more violently, which caused me to scream again.

(Pltf's Decl., ECF No. 137 at 86 ¶6.)

> I was feeling extreme headache and I felt lightheaded, real dizzy .
> . .   And I already had a bruise, which I saw bruises on my chest
> and back area where my shoulder felt – it was already inflamed.

(Depo. 46:10-16.)

///

///

15

Plaintiff's evidence includes a declaration dated August 12, 2012, by Armando Sanders, V-28669, a state prisoner who was Plaintiff's cell mate in January 2006 during the events at issue.

> I stood up and looked through the window of the dining hall side door, where I saw C/O's R. Reyna and N. Correa pulling Lacy's cuffed hands upwards about two feet away from his back, while Lacy was bent over at the waist.

(Decl. of Armando Sanders, ECF No. 137 at 96 ¶9.)

The Court finds that Plaintiff has demonstrated that genuine issues exist for trial on his excessive force claim against defendant Correa. The facts are disputed as to whether defendant Correa applied unnecessary force to Plaintiff during the escort.

## B.     FAILURE TO PROTECT – DEFENDANTS PEACOCK AND TYSON

The Eighth Amendment protects prisoners from inhumane methods of punishment and from inhumane conditions of confinement. Morgan v. Morgensen, 465 F.3d 1041, 1045 (9th Cir. 2006). Although prison conditions may be restrictive and harsh, prison officials must provide prisoners with food, clothing, shelter, sanitation, medical care, and personal safety. Farmer, 511 U.S. at 832-33, (internal citations and quotations omitted). Prison officials have a duty to take reasonable steps to protect inmates from physical abuse. Id. at 833; Hearns v. Terhune, 413 F.3d 1036, 1040 (9th Cir. 2005).

To establish a violation of this duty, the prisoner must establish that prison officials were "deliberately indifferent to a serious threat to the inmate's safety." Farmer at 834. "The question under the Eighth Amendment is whether prison officials, acting with deliberate indifference, exposed a prisoner to a sufficiently substantial 'risk of serious damage to his future health . . .'" Id. at 843 (citing Helling v. McKinney, 509 U.S. 25, 35 (1993)). The Supreme Court has explained that "deliberate indifference entails something more than mere negligence ... [but] something less than acts or omissions for the very purpose of causing harm or with the knowledge that harm will result." Farmer at 835. The Court defined this "deliberate indifference" standard as equal to "recklessness," in which "a person disregards a risk of harm of which he is aware." Id. at 836-37.

///

The deliberate indifference standard involves both an objective and a subjective prong. First, the alleged deprivation must be, in objective terms, "sufficiently serious."  Id. at 834. Second, subjectively, the prison official must "know of and disregard an excessive risk to inmate health or safety."  Id. at 837; Anderson v. County of Kern, 45 F.3d 1310, 1313 (9th Cir. 1995).   To prove knowledge of the risk, however, the prisoner may rely on circumstantial evidence; in fact, the very obviousness of the risk may be sufficient to establish knowledge. Farmer, 511 U.S. at 842; Wallis v. Baldwin, 70 F.3d 1074, 1077 (9th Cir. 1995).

Defendants Sgt. Peacock and Captain Tyson argue that they did not fail to intervene to prevent a serious risk of harm to Plaintiff resulting from Defendants' use of force during the escort, because no such risk existed, and excessive force was not used.  Defendants also assert that it is undisputed that defendant Tyson did not touch Plaintiff or otherwise participate in the escort.  Defendants cite Plaintiff's deposition testimony at 39:11-14, 44:25-45:8, and 48:15-19, in support their arguments.  (ECF No. 121 at 17 ¶II.B; ECF No. 121-12 at 4 ¶¶21, 22, 26.) However, the deposition testimony cited by Defendants, shown directly below, does not support their arguments.

> And maybe about 30 seconds later, defendant Brookwalter returned to the holding cell cage, opened the cage, told me to stand up, and proceeded to grab me, helping me stand up.

(Depo. 39:11-14.)

> Q.   All right.  And what kind of force, if any, did Brookwalter use on you in the holding cage?
>
> A.   As soon as he opened up the door he grabbed me, pulling me up. And at that time he's telling me to stand up as he's pulling me up. And I really did not have a chance to respond at that time because he's already grabbing me.  And as I try to stand up, as he's grabbing me.  He started slamming me and pushing me, jerking me up against the cage, inside of the cage – inside of the cage, up against the cage inside of it.

(Depo. 44:25-45:8.)

> Q.   And then T. Reyna had one leg?
>
> A.   Yes.
>
> Q.   And someone else had another leg?

A.    Yes.

Q.    When M. Bremnar and Brookwalter had you --

(Depo. 48:15-19.)

The Court finds that defendants Peacock and Tyson have not met their burden on summary judgment for Plaintiff's claims that they failed to protect him from excessive force.

## C.    SUPERVISORY LIABILITY – DEFENDANTS PEACOCK AND TYSON

To the extent that Plaintiff seeks to hold defendants Peacock and Tyson liable for supervisory liability, Plaintiff may not do so.  "Liability under [§] 1983 arises only upon a showing of personal participation by the defendant.  A supervisor is only liable for the constitutional violations of . . . subordinates if the supervisor participated in or directed the violations, or knew of the violations and failed to act to prevent them.  There is no *respondeat superior* liability under [§] 1983."  Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989) (citations omitted).  Plaintiff must demonstrate that each defendant, through his or her own individual actions, violated Plaintiff's constitutional rights.  Ashcroft v. Iqbal, 556 U.S. 662, 676, 129 S.Ct. 1937, 1948 (2009); Corales v. Bennett, 567 F.3d 554, 570 (9th Cir. 2009). Therefore, to the extent that Plaintiff seeks to impose liability upon any of the Defendants in their supervisory capacity, Plaintiff cannot state a claim.

## D.    MEDICAL CLAIM – DEFENDANTS BREMNAR, BROOKWALTER, PEACOCK, TYSON, ASPEITIA-FLEMING, AND PATEL

### 1.    **Legal Standard**

"[T]o maintain an Eighth Amendment claim based on prison medical treatment, an inmate must show 'deliberate indifference to serious medical needs.'"  Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006) (quoting Estelle v. Gamble, 429 U.S. 97, 104, 97 S.Ct. 285 (1976)). The two-part test for deliberate indifference requires the plaintiff to show (1) "'a serious medical need' by demonstrating that 'failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain,'" and (2) "the defendant's response to the need was deliberately indifferent."  Jett, 439 F.3d at 1096 (quoting McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1992), overruled on other grounds by WMX

Techs., Inc. v. Miller, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc) (internal quotations omitted)).   The existence of a serious medical need is the objective element of an Eighth Amendment claim and deliberate indifference is the subjective element.   Snow v. McDaniel, 681 F.3d 978, 985 (9th Cir. 2012).

### Objective Element – Serious Medical Need

Indications of a serious medical need are (1) the existence of an injury that a reasonable doctor would find important and worthy of comment or treatment, (2) the presence of a medical condition that significantly affects an individual's daily activities, and/or (3) the existence of chronic or substantial pain. Snow, 681 F.3d at 982-85 (objectively serious medical need existed where prisoner who needed double hip replacement surgery endured a years-long delay and his degenerated condition caused him excruciating pain and rendered him barely able to walk); Wilhelm v. Rotman, 680 F.3d 1113, 1122 (9th Cir. 2012) (hernia constituted objectively serious medical need where it caused the prisoner pain and he endured an approximately 4 year delay before receiving necessary surgery); Lopez v. Smith, 203 F.3d 1122, 1131 (9th Cir. 2000) (objectively serious medical need existed where prisoner's broken jaw was wired shut for months, affecting his ability to eat and likely causing him pain) (quotation marks omitted); see also McGuckin, 974 F.2d at 1059-62, overruled on other grounds by WMX Techs., Inc., 104 F.3d at 1136 (en banc) (objectively serious medical need existed where prisoner endured a more than 3 ½ year delay in receiving back surgery for "dramatic" condition "constituting massive herniation" of inmate's back and upper torso, which caused inmate extreme, increasing pain which was successfully treated by the surgery); Hunt v. Dental Dept., 865 F.2d 198, 200 (9th Cir. 1989) (objectively serious medical need existed where prisoner went more than 3 months without his dentures, resulting in severe pain, bleeding gums, broken and permanently damaged teeth, and weight loss due to inability to eat properly); Doty v. County of Lassen, 37 F.3d 540, 546 n.3 (9th Cir. 1994) (no objectively serious medical need where prisoner suffered from nausea, shakes, headache, and depressed appetite due to unresolved family stress).

///

///

*Subjective Element – Deliberate Indifference*

Deliberate indifference is shown by "a purposeful act or failure to respond to a prisoner's pain or possible medical need, and harm caused by the indifference." Wilhelm, 680 F.3d at 1122) (citing Jett, 439 F.3d at 1096). The requisite state of mind is one of subjective recklessness, which entails more than ordinary lack of due care. Snow, 681 F.3d at 985 (citation and quotation marks omitted); Wilhelm, 680 F.3d at 1122. "Deliberate indifference is a high legal standard," Toguchi v. Chung, 391 F.3d 1051, 1060 (9th Cir. 2004), and "[u]nder this standard, the prison official must not only 'be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists,' but that person 'must also draw the inference, '" Id. at 1057 (quoting Farmer, 511 U.S. at 837). "'If a prison official should have been aware of the risk, but was not, then the official has not violated the Eighth Amendment, no matter how severe the risk.'" Id. (quoting Gibson v. County of Washoe, Nevada, 290 F.3d 1175, 1188 (9th Cir. 2002)). "A showing of medical malpractice or negligence is insufficient to establish a constitutional deprivation under the Eighth Amendment." Toguchi, 391 F.3d at 1060. "[E]ven gross negligence is insufficient to establish a constitutional violation." Id. (citing Wood v. Housewright, 900 F.2d 1332, 1334 (9th Cir. 1990)).

Where a prisoner is alleging a delay in receiving medical treatment, the delay must have led to further harm in order for the prisoner to make a claim of deliberate indifference to serious medical needs. McGuckin at 1060 (citing Shapely v. Nevada Bd. of State Prison Comm'rs, 766 F.2d 404, 407 (9th Cir. 1985)).

 "A difference of opinion between a prisoner-patient and prison medical authorities regarding treatment does not give rise to a § 1983 claim." Franklin v. Oregon, 662 F.2d 1337, 1344 (9th Cir. 1981) (internal citation omitted). To prevail, plaintiff "must show that the course of treatment the doctors chose was medically unacceptable under the circumstances . . . and . . . that they chose this course in conscious disregard of an excessive risk to plaintiff's health." Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1996) (internal citations omitted).

///

### 2. <u>Defendants' Position</u>

#### a. **Defendants Bremnar, Brookwalter, Peacock, Tyson, and Aspeitia-Fleming**

Defendants argue that defendants Bremnar, Brookwalter, Peacock, Tyson, and Aspeitia-Fleming were not deliberately indifferent because Plaintiff had been evaluated and found to be free of injuries requiring further treatment. Defendants assert that Plaintiff was evaluated immediately before, and shortly after the escort at his request, by MTA Aspeitia-Fleming, and the MTA did not find during either examination the Plaintiff had more than superficial scrapes.

Defendants Bremnar, Brookwalter, Peacock, and Tyson also argue that their actions did not rise to the level of deliberate indifference, because they reasonably relied on MTA Aspeitia-Fleming's medical determination clearing Plaintiff to return to administrative segregation and his cell, when they escorted Plaintiff with assistance to his cell, ignoring Plaintiff's requests for additional medical care. Defendants argue that although Plaintiff disputes Aspeitia-Fleming's findings, he has not provided any evidence, besides his own opinion, that he required further medical care while he was in the holding cell, and that Plaintiff's dispute with Aspeitia-Fleming does not rise to the level of deliberate indifference. Defendants argue that custody staff, including Sergeants Bremnar, Brookwalter, and Peacock, and Captain Tyson, reasonably relied on this medical determination when, after they received notice that Plaintiff was medically cleared, they escorted Plaintiff with assistance to his cell and ignored Lacy's requests for additional medical care. Defendants argue that since Sergeants Bremnar, Brookwalter, and Peacock, and Captain Tyson, as custody staff, were unqualified to dispute MTA Aspeitia-Fleming's medical clearance, and Lacy had not shown obvious visible symptoms indicating a serious medical need, they did not act with deliberate indifference in ignoring Plaintiff's request for additional medical attention.

Moreover, subsequent medical treatment did not indicate the presence of a serious medical need during the escort. After Plaintiff arrived in his cell and requested additional medical evaluation, he was evaluated again by MTA Aspeitia-Fleming, who found no evidence of injury aside from Plaintiff's subjective complaints. Plaintiff was further evaluated by

nursing staff later that day, treated for his subjective pain and his shoulder was x-rayed with a finding of no evidence of injury.

Defendants submit as evidence Plaintiff's deposition testimony, the declarations of defendants Aspeitia-Fleming, Brookwalter, Patel, and Tyson, and the declaration of Registered Nurse H. Tuhin [not a defendant].

### After the escorts, at Plaintiff's cell

Q.   All right.  So if I have it right, three to five minutes after he started yelling, "Man down," Huff arrived three to five minutes later.  You got Parker and Singleton at your cell.  You explained the situation and you walked with Officers Parker and Singleton to medical?

A.   Yes.

(Depo. 69:18-24.)

Q.   And you saw [Aspeitia] again at medical, correct?

A.   Yes.

Q.   Did she fill out a 7219 or do you know?

A.   Yes, that's the one that I received out of my medical file.

(Depo. 70:5-10.)

### MTA Aspeitia-Fleming's Declaration describing her exams of Plaintiff

I examined Lacy at approximately 9:50 a.m., and noted that Lacy had an abrasion or scratch on his right temple.  I documented my examination of Lacy on a 7219 form.  A true copy of this form is attached as Exhibit C.

Lacy did not tell me the cause of this injury, did not complain of pain, or make any other statement to me.

I examined Lacy a second time at 11:00 a.m. that morning, when Officer Singleton escorted him to the medical clinic.  I documented my examination of Lacy on a 7219 form.  A true copy of this form is attached as Exhibit D.

During the examination, I observed the same scratch to Plaintiff's right temple or eye, but no other injuries.

Lacey told me during the examination that "[he] got [his] arm twisted" by staff.  I examined Lacy's arms and found no evidence of any injury consistent with forceful twisting.  Because Lacy made allegations against staff, and complained of pain, I referred Lacy for further examination to a registered nurse.  However,

22

> Lady's non-serious injuries did not preclude him from returning to his cell in administrative segregation after the examination. I did not fail to provide Lacy access to appropriate medical care. Rather, I referred him to a registered nurse when he complained of pain.

(Aspeitia-Fleming Decl., ECF No. 121-2 ¶¶8, 9, 11, 13-17.)

### *When Plaintiff was in the holding cage*

> And at that time I explained to them that I was having severe headache, feeling dizzy, lightheaded, and I had just been assaulted by Officer R. Reyna and that I needed medical attention. And they left the room. And maybe about 30 seconds later, defendant M. Brookwalter returned to the holding cell cage, opened the cage, told me to stand up, and proceeded to grab me, helping me to stand up.

(Depo. 39:7-14.)

> I responded to him that I needed medical attention.

(Depo. 47:18-19.)

> As soon as he opened up the door he grabbed me, pulling me up. And at that time he's telling me to stand up as he's pulling me up. And I really did not have a chance to respond at that time because he's already grabbing me. And as I try to stand up, as he's grabbing me. He started slamming me and pushing me, jerking me up against the cage, inside of the cage – inside of the cage, up against the cage inside of it.

(Depo. 44:25-45:8.)

### *During the Second Escort*

Defendant Brookwalter declared as follows:

> At some point in the morning, Sergeants Bremnar and Peacock requested my assistance after telling me that Lacy had been counseled and was refusing to leave the holding cell and return to Building 3 which was Lacy's assigned housing unit. I went to the Program Office and talked with Lacy, who was in a holding cell. Lacy did not tell me or anyone else present with us that he had been assaulted by staff. I told Lacy to walk out of the holding cell and return to his housing unit. . . Upon arriving at the entrance of Building 3, the escorting officers placed Lacy on the ground and instructed him to return to his cell.

(Brookwalter Decl., ECF No. 121-4 ¶¶4-7, 13.)

> Q.     Did you voice any complaints at all while you were being carried to –
>
> A.     Not.

23

Q.      -- Housing Unit Three?

A.      Not while I was being carried, no.

(Depo. 55:11-15.)

A.      No, they – I responded to them [Officers T. Reyna, Brookwalter, and Bremner] that I don't believe I can walk at that point because I was feeling disoriented and that I needed medical attention. And right then, again, I was – Brookwalter gave further order to pick me back up and they proceeded to carry me again.

Q.      So after they made those comments to you, you said you couldn't walk, correct?

A.      Yes.

Q.      And then they picked you up in the same fashion as before; Brookwalter on your left arm, Bremnar on your right?

A.      Yes.

(Depo. 58:14-59:1.)

Defendant Tyson declared as follows:

Lacy's allegations in his complaint that, after dropping to the ground, he was assisted upright and carried to the administrative segregation building by correctional staff was not required to be reported as a use of force under Title 15, Section 3268.1. Custody staff complied with CDCR policies and procedures when they carried Lacy to the administrative segregation building after Lacy stopped walking on his own power during an escort.

(Tyson Decl., ECF No. 121-11 ¶¶10, 11.)

### b.  <u>Defendant Patel</u>

Defendant Patel argues that he provided adequate and appropriate treatment for Plaintiff's complaint of shoulder pain, offering Patel's declaration as evidence.  Patel declares that he examined Plaintiff on March 20, 2006, May 30, 2006, and June 6, 2006.  (Patel Decl., ECF No. 121-7 ¶2.)  On March 20, 2006, Plaintiff told Patel that his left shoulder hurt.  (Id. ¶¶3, 4.)  He examined Plaintiff's shoulder and determined that a MRI was not necessary.  (Id. ¶5.)  He noted on the form that Plaintiff had a history of left shoulder pain since January 2006, but an x-ray of the shoulder area indicated it was normal.  (Id.)  Patel prescribed physical therapy.  (Id.)  On May 30, 2006, Patel examined Plaintiff in response to his requests for copies of his medication and physical therapy orders.  (Id. ¶8.)  Plaintiff told Patel he had tenderness in

his shoulder, did not have a full range of motion, and that he did not have physical therapy.  (Id. ¶9.)  Patel examined Plaintiff and found subjective tenderness, a subjective lack of a full range of motion, and that Plaintiff had a high blood pressure reading.  (Id. ¶10.)  He reviewed Plaintiff's Physician Request for Services form, which indicated that Plaintiff was scheduled for physical therapy appointments on April 3, 2006 and April 10, 2006, but did not attend.  (Id. ¶11.)  The form stated that Plaintiff refused to attend the April 3, 2006 appointment and was rescheduled to April 10, 2006 but did not show up for the appointment.  (Id. ¶¶11-13.)  During the June 6, 2006 appointment, Plaintiff asked Patel if he knew when he was scheduled to see the physical therapist, and Patel called the physical therapist who said that Plaintiff had not attended his two scheduled appointment.  (Id. ¶¶16, 19.)  Plaintiff told Patel that he did not know about the appointments.  (Id. ¶20.)  Patel noted in Plaintiff's June 6, 2006 progress notes that he believed that most likely Plaintiff was not taken to the Correctional Treatment Center for physical therapy because he was in administrative segregation and the escorting officers may have been temporarily unavailable due to safety or security concerns; however, he does not independently recall the June 6 appointment or the security and staffing considerations present for Plaintiff's housing unit during that time, and he does not know why Plaintiff failed to attend the physical therapy appointments.  (Id. ¶21.)  Plaintiff complained of decreased range of motion in his left shoulder due to pain.  (Id. ¶17.)  Patel found that Plaintiff's blood pressure was 140/90 and ruled out hypertension as a cause for the elevated blood pressure.  (Id. ¶17, 18.)  Patel declares that he is not responsible for scheduling physical therapy appointments or arranging escorts of inmates to physical therapy appointments; this duty is handled by nursing staff and custody staff. (Id. ¶23.)  Patel ordered Plaintiff a 90 day prescription for Indocin (indomethacin) and ducated Plaintiff for weekly blood pressure checks each week for found weeks, and a follow up visit in five weeks.  (Id. ¶24.)  Patel declares that in his medical opinion, Plaintiff did not require immediate or emergency medical attention or an urgent need for physical therapy for his physical condition when he examined Plaintiff on March 20, 2006, May 30, 2006, or June 6, 2006.  (Id. ¶25.)

///

### c.      **Defendants' Burden**

The Court finds that defendants Bremnar, Brookwalter, Peacock, Tyson, Aspeitia-Fleming, and Patel have met their burden on summary judgment for Plaintiff's Eighth Amendment medical claims against them.  There is no evidence that any of these defendants drew an inference before or during the second escort that Plaintiff had serious injuries or that Plaintiff faced a substantial risk of serious harm without immediate medical treatment.  Moreover, they have submitted evidence indicating it was not their responsibility to provide medical treatment.  The burden now shifts to Plaintiff to designate specific facts demonstrating the existence of genuine issues for trial on these claims.

### 3.      **Plaintiff's Opposition**

Plaintiff argues that he had a serious medical need, because he had severe shoulder pain from a broken collarbone.  Plaintiff's evidence is found in Plaintiff's deposition testimony, his declaration, and the declarations of inmate witnesses Armando Sanders and R. Brooks.

While being escorted from the dining hall to the program office, officers jerked Plaintiff's arms upwards above his shoulders, causing him to scream in pain.  (Depo at 25:16-25, 29:20-25; Lacey Decl., ECF No 137 86 ¶6.)  While in a holding cell outside the program office, plaintiff told MTA Aspeitia-Fleming that he had severe shoulder pain.  (Lacey Decl. 86-87 ¶7.) While officers carried Plaintiff from the program office to Housing Unit Three, they violently jerked Plaintiff's arm upwards above his shoulders, causing him to scream in pain.  (Id. at 87 ¶10.)  While Plaintiff was carried to his cell, Officer Brookwalter violently jerked Plaintiff's left arm, causing him to scream in pain.  (Id. at 87 ¶11; Decl. of Armando Sanders, ECF No. 137 at 96-97 ¶¶10, 11; Decl. of R. Brooks, ECF No. 137 at 102 ¶7.)  On October 28, 2008, after Plaintiff was transferred from KVSP to Salinas Valley State Prison, Plaintiff received an x-ray of his left shoulder, which revealed evidence of a prior clavicle (collarbone) fracture.  (Lacy Depo. at 86:12-87:5; Lacy Decl. at 89 ¶¶16, 17 & Attachment 1.)

Plaintiff also argues that defendants Aspeitia-Fleming, Bremnar, Brookwalter, Patel, Peacock, and T. Reyna were deliberately indifferent to his serious medical needs.  Plaintiff asserts that while in the program office holding cell, he notified defendants Aspeitia-Fleming,

Bremnar, and Peacock that he had severe shoulder pain and was light-headed and dizzy from being assaulted by staff.   (Depo. at 33:22-34, 46:6-20; Lacy Decl. at 86-87 ¶7.)   After examining Plaintiff, MTA Aspeitia-Fleming not only failed to document his injuries, but she cleared Plaintiff to be returned to his housing unit, stating that nothing was wrong with him. (Depo. at 35:7-12; Lacy Decl. at 86-87 ¶7, 8; Aspeitia-Fleming Decl., ECF No. 121-2 ¶10 & Exh. C.)   Defendants Bremnar, Brookwalter, Peacock, and T. Reyna failed to obtain medical assistance for Plaintiff's injuries and then subjected him to further excessive force which served to exacerbate those injuries.   (Depo. at 36:14-20, 39:13-19, 41:8-12; 44:25-46:20, 55:19-56:10, 58:14-22; Lacy Decl. ¶¶8-11, 21; Sanders Decl. ¶10-11; Brooks Decl. ¶7.)

Plaintiff argues that defendants Bremnar, Brookwalter, Peacock, and T. Reyna should not have relied on MTA Aspeitia-Fleming's medical evaluation of Plaintiff, because the MTA's duties did not include diagnosing and treating Plaintiff's shoulder injury and she was not capable of such. (Cal.Code Regs, tit. 15 §3354(a); Aspeitia-Fleming's Decl. ¶2.)

Plaintiff also argues that CDCR regulations required defendants Bremnar and Peacock to summon medical assistance for Plaintiff when they observed the MTA's failure to do so, and required defendant Brookwalter to summon medical assistance instead of responding to Plaintiff's complaint of shoulder pain by grabbing and jerking the injured arm.   (Cal.Code Regs., tit. 15 §3271; Depo. at 41:8-12; Lacy Decl. ¶¶10-11; Sanders Decl. ¶10-11; Brooks Decl. ¶7.)

With respect to defendant Dr. Patel, Plaintiff argues that Patel's findings -- that Plaintiff's complaints of pain and loss of function in his left shoulder were "subjective" and that an MRI, CT scan, or additional x-rays were not necessary – were medically unacceptable given Plaintiff's continued complaints of loss of function in his shoulder, and that Patel chose treatments for Plaintiff in conscious disregard of Plaintiff's health.   As evidence, Plaintiff submits pages from the Merck Manual of Medical Information, 2d Home Edition (2003 ed.). (Merck Manual, Pltf's Exhibit J, ECF No. 137.)   Page 350 of the Merck Manual states that "[s]mall or nondisplaced bone fractures are difficult to see on routine x-rays, and sometimes additional x-rays are taken a different angles."   (Id. at p. 350)   Page 351 states that "[f]ractures

require immediate attention because they cause pain and loss of function" (Id. at p. 351.)

### 4. Discussion

The following facts are undisputed.[4]   On January 27, 2006, at KVSP, Plaintiff was handcuffed and escorted to the Program Office by Officers Correa and R. Reyna.  (Defendants' Undisputed Facts (DUF) 12, 13; Depo. 29:7-25.)[5]   Plaintiff was medically evaluated by MTA Aspeitia-Fleming in the Program Office holding cell at approximately 9:50 a.m., for placement into administrative segregation (Ad-Seg).  (DUF 15.)   MTA Aspeitia-Fleming found that Plaintiff had an abrasion or scratch above his right eye and documented the evaluation on a CDC 7219 form.  (DUF 16.)   The MTA found that Plaintiff did not require further medical treatment and cleared Plaintiff for placement in Ad-Seg.  (DUF 18; Depo. 35:7-12.)[6]

Plaintiff told Officer T. Reyna and another unidentified officer that he was dizzy and lightheaded, had been assaulted by Officer R. Reyna, and that he needed medical attention. (DUF 19, 20.)  Plaintiff was carried face down by Officers T. Reyna, Bremnar, Brookwalter, and an unidentified officer, out of the Program Office, across the yard, to the track area in front of Housing Unit 3.  (DUF 26, 28, 29.)  Plaintiff said that he could not walk and needed medical attention.  (DUF 34.)   The officers carried Plaintiff inside the housing unit to his cell.  (DUF 36.)  Plaintiff's cell mate banged on the door and shouted "Man down!"  (DUF 40.)   Officer Hupp responded to Plaintiff's cell and Plaintiff told her he wanted medical attention for his "dislocated" shoulder.  (DUF 41.)  Officer Hupp reported Plaintiff's condition, and correctional staff assisted Plaintiff to his feet.  (DUF 42, 43.)  At approximately 11:00 a.m., Plaintiff was seen by MTA Aspeitia-Fleming in the medical clinic.  (DUF 45.)   The MTA found that

---

[4] These facts are undisputed for the sole purpose of this motion. The Court has compiled this summary from Defendants' statement of undisputed facts, Plaintiff's statements of disputed and undisputed facts, and Plaintiff's verified Second Amended Complaint. A verified complaint in a pro se civil rights action may constitute an opposing affidavit for purposes of the summary judgment rule, where the complaint is based on an inmate's personal knowledge of admissible evidence, and not merely on the inmate's belief. McElyea, 833 F.2d at 197-98; Lew, 754 F.2d at 1423; Fed. R. Civ. P. 56(e).

[5] Plaintiff disputes DUF 12 in part but does not dispute these facts.

[6] Plaintiff disputes DUF 18 in part but does not dispute these facts.

Plaintiff had an abrasion or scratch above his right eye and documented the evaluation on a CDC 7219 form.  (DUF 46.)  Plaintiff told the MTA that he had allegations against staff, and that he got his arm twisted.  (DUF 47.)  Plaintiff was subsequently seen by Nurse Tuhin who examined Plaintiff and determined he was alert and oriented, and his vital signs were within normal limits.  (DUF 51-53.)  Plaintiff alleged that he had pain moving his shoulder on a nine out of ten scale.  (DUF 57.)  Nurse Tuhin assessed that Plaintiff had subjective pain without evidence of injury and contacted Dr. Akanno for recommendation of a pain medication.  (DUF 58-59.)  Dr. Akanno prescribed Motrin for Plaintiff's claimed pain and ordered x-rays for his left shoulder.  (DUF 60.)  Plaintiff was told the x-rays were negative.  (DUF 61; Depo. 86:17-18.)[7]

On March 20, 2006, Plaintiff was examined by Dr. Patel, in response to Plaintiff's complaint of shoulder pain.  (DUF 63.)  During the examination, Plaintiff told Dr. Patel that his left shoulder hurt.  (DUF 64.)  Dr. Patel examined Plaintiff's shoulder, and determined that an MRI was not necessary.  (DUF 65.)  Dr. Patel observed that although Plaintiff had a history of left shoulder pain since January 2006, an x-ray of the left shoulder indicated it was normal.  (Id.)  Dr. Patel prescribed routine physical therapy and completed a Health Care Services Physician Request for Service form to facilitate that therapy.  (DUF 66.)

On May 30, 2006, after Plaintiff requested copies of his medication and physical therapy orders, Dr. Patel saw Plaintiff.  (DUF 67.)  During the examination, Plaintiff told Dr. Patel that he had tenderness in his shoulder, did not have a range of full motion, and had not received his physical therapy.  (DUF 68.)  Dr. Patel examined Plaintiff and found subjective tenderness, a subjective lack of a full range of motion, and that Lacy had a high blood pressure reading.  (DUF 69.)  Since Plaintiff told Dr. Patel that he did not receive his physical therapy, Dr. Patel reviewed the Physician Request for Service form in Plaintiff's 2006 Unit Health Record.  (DUF 70.)  Dr. Patel observed that the "consultation" portion of the form had been completed, and it indicated that Plaintiff was scheduled for a physical therapy appointment on

---

[7] Plaintiff disputes DUF 61 in part but does not dispute these facts.

April 3, 2006, but Plaintiff refused to attend.  (Id.)  Dr. Patel observed that the April 3, 2006 appointment was rescheduled for April 10, 2006, and Plaintiff did not attend.  (Id.)  Dr. Patel did not author the "consultation" portion of the form.  (Id.)  Because Plaintiff alleged that he had not received physical therapy, Dr. Patel noted in the May 30, 2006 Outpatient Interdisciplinary Progress note that he would call the physical therapist at the specialty clinic to verify that Plaintiff was ducated for his physical therapy appointments.  (DUF 71.)

On June 6, 2006, after Lacy requested a blood test, physical examination, and refill of his indomethacin prescription, Dr. Patel saw Plaintiff again.  (DUF 72.)  Plaintiff asked Dr. Patel during the examination if Dr. Patel knew when Plaintiff was scheduled to see the physical therapist.  (DUF 73.)  During the examination, Plaintiff told Dr. Patel that his left shoulder had a decreased range of motion due to pain.  (DUF 74.)  Dr. Patel found that Plaintiff's blood pressure was 140/90 and ruled out hypertension as a cause of the elevated blood pressure.  (Id.)  Because Plaintiff asked Dr. Patel if Dr. Patel knew when Plaintiff was scheduled to see a physical therapist, Dr. Patel called the physical therapist, who told him that Plaintiff did not attend two previously scheduled appointments.  (DUF 75.)  After Dr. Patel told Plaintiff that the physical therapist said that Plaintiff did not attend the scheduled appointments, Plaintiff told Dr. Patel that he did not know about the appointments.  (DUF 76.)  During the examination, Dr. Patel believed that most likely Plaintiff was not taken to the Correctional Treatment Center because he was in Ad-Seg and the escorting officers may have been temporarily unavailable due to safety or security concerns.  (DUF 77.)  But Dr. Patel does not recall the security and staffing considerations that may have existed in Plaintiff's housing unit on the dates when the physical therapy appointments were scheduled.  (Id.)  Moreover, Dr. Patel does not know why Plaintiff did not attend the physical therapy appointments on the dates they were scheduled.  (Id.)  Dr. Patel believes that nursing staff at the specialty clinic are responsible for scheduling physical therapy appointments, and custody staff is responsible for arranging appointments.  (DUF 78.)  Dr. Patel is not responsible for scheduling physical therapy appointments or arranging escorts of inmates to physical therapy appointments.  (Id.)  During the June 6, 2006 appointment, Dr. Patel ordered a 90 day prescription for Indocin (indomethacin) and ducated

Plaintiff for weekly blood pressure checks each week for four weeks, with a follow up visit in five weeks. (DUF 79.) In Dr. Patel's medical opinion, Plaintiff did not require immediate or emergency medical attention, including an emergent or urgent need for physical therapy for his physical condition when Dr. Patel examined him on March 20, 2006, May 30, 2006, or June 6, 2006. (DUF 80.)[8]

The Court finds that Plaintiff had a serious medical need when he was placed in the Program Office holding cell, and afterward when he was escorted to his cell in the Housing Unit. Drawing all inferences in the light most favorable to Plaintiff, Plaintiff was suffering from a fractured clavicle, causing him severe and ongoing pain. There is no dispute that a reasonable doctor would find such a fracture in a patient to be important and worthy of comment or treatment.

However, the Court finds no conclusive evidence that Plaintiff's fracture was discoverable until after he was transferred from KVSP to Salinas Valley State Prison where he received additional x-rays showing the fracture.

Even assuming that Plaintiff had a fractured clavicle at the time of the events at issue, Defendants' actions do not support a claim of deliberate indifference. Evidence shows that Plaintiff received medical examinations and treatment for his complaints of shoulder pain. The undisputed facts show that Plaintiff was given multiple medical examinations in response to his complaints of pain and complaints that his arms had been twisted, x-rays by medical personnel, medications, and orders for physical therapy. During two examinations, MTA Aspeitia-Fleming found that Plaintiff's only injury was an abrasion or scratch above his right eye. (DUF 12, 13, 15, 16, 18.) When Plaintiff was returned to his cell and his cell mate yelled "Man Down," Officer Hupp [not a defendant] responded and reported Plaintiff's condition to authorities, (DUF 41, 42, 43), after which the MTA gave Plaintiff his second examination. (DUF 45, 46.) After Plaintiff complained that his arm had been twisted by staff, he was seen by Nurse Tuhin [not a defendant] who determined that Plaintiff only had subjective pain

---

[8] Plaintiff disagrees with Dr. Patel's opinions but does not dispute that these are Dr. Patel's opinions. Therefore, DUF 80 is undisputed.

without evidence of injury.  (DUF 51-53, 58-59.)  Nurse Tuhin contacted Dr. Akanno [not a defendant] for a recommendation of pain medication, and Dr. Akanno prescribed Motrin and ordered x-rays for Plaintiff's left shoulder, which were found to be negative.  (DUF 59, 60, 61; Decl. of Dr. Akanno, ECF No. 121-1 ¶7 & Attachment 1.)  Plaintiff was later seen by Dr. Patel three times between March 20 and June 6, 2006, who found that Plaintiff's x-rays were negative, prescribed physical therapy and the medication indomethacin, monitored Plaintiff's blood pressure, and followed up in an attempt to ascertain why Plaintiff had not received physical therapy as ordered.  (DUF  63-77.)

Plaintiff's allegation in the Second Amended Complaint -- that MTA Aspeitia-Fleming told him the reason she didn't provide proper medical treatment was because he was a "rat" and on a Protective Custody yard[9] – gives the Court pause, because such a statement is evidence that the MTA acted with deliberate indifference to Plaintiff's medical needs.  However, since this allegation was not addressed in the motion for summary judgment, and evidence shows that MTA Aspeitia-Fleming provided Plaintiff with two medical examinations in response to his symptoms and referred him to Nurse Tuhin for further evaluation, summary judgment on Plaintiff's claims against the MTA is appropriate.

Plaintiff argues that according to the Merck Manual, his treatment at KVSP was not medically acceptable.  To prevail on this theory, Plaintiff must show that the course of treatment the doctors chose was medically unacceptable under the circumstances.  Jackson , 90 F.3d at 332.   However, the treatment discussed in the Merck Manual assumes that the doctor knows the patient has a fractured clavicle, which was not the case for Plaintiff when he was being treated at KVSP.  Plaintiff also states his belief that the reports of negative findings in the x-rays were part of a cover-up at KVSP, (Depo. at 86:12-87:5), but Plaintiff shows no evidence of a cover-up.  With respect to the delay in Plaintiff's treatment for a broken clavicle, Plaintiff shows no evidence that the delay was a result of deliberate indifference by any of the Defendants.

---

[9] Second Amended Complaint, Doc. 16 at 7:1-3.

To the extent that Plaintiff claims that Dr. Patel was deliberately indifferent because Plaintiff did not receive physical therapy, evidence shows that Dr. Patel ordered the physical therapy and reasonably assumed that the nursing staff had scheduled the appointments and correctional staff would escort Plaintiff to the appointments, as these duties were not Dr. Patel's responsibilities.  When Plaintiff informed Dr. Patel that he had not gone to physical therapy, Dr. Patel followed up in an attempt to ascertain what had happened and re-ordered the physical therapy.  Under these facts, there is no evidence that Dr. Patel acted against Plaintiff with deliberate indifference.

There also is no evidence that defendants Bremnar, Brookwalter, Peacock, or Tyson knew that Plaintiff was at risk for serious harm without further medical attention.  Even if these defendants did not rely on the results of Plaintiff's examinations by the MTA, there is no evidence that any of them had the requisite state of mind for deliberately indifference.  There is no evidence that that they believed Plaintiff's pain was severe or that Plaintiff had fractured his clavicle.

Based on the foregoing, Plaintiff has not shown a genuine dispute of material fact for trial on this issue, and defendants Bremnar, Brookwalter, Peacock, Tyson, and Aspeitia-Fleming are entitled to summary judgment on Plaintiff's medical claim against them.

## V.    QUALIFIED IMMUNITY

Finally, Defendants argue that they are entitled to qualified immunity.   Qualified immunity is "immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial."  Mueller v. Auker, 576 F.3d 979, 993 (9th Cir. 2009) (citation and internal quotations omitted).  Qualified immunity shields government officials from civil damages unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727 (1982).  "Qualified immunity balances two important interests - the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably," Pearson v. Callahan, 555 U.S. 223,

231, 129 S.Ct. 808 (2009), and it protects "all but the plainly incompetent or those who knowingly violate the law," Malley v. Briggs, 475 U.S. 335, 341, 106 S.Ct. 1092 (1986).

In resolving the claim of qualified immunity, the Court must determine whether, taken in the light most favorable to Plaintiff, Defendants' conduct violated a constitutional right, and if so, whether the right was clearly established. Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151 (2001); Mueller, 576 F.3d at 993. While often beneficial to address in that order, the Court has discretion to address the two-step inquiry in the order it deems most suitable under the circumstances. Pearson, 555 U.S. at 236 (overruling holding in Saucier that the two-step inquiry must be conducted in that order, and the second step is reached only if the court first finds a constitutional violation); Mueller, 576 F.3d at 993-94.

As discussed above, the Court has found that all of the Defendants are entitled to summary judgment on Plaintiff's medical claim, and that defendant Peacock is entitled to summary judgment on Plaintiff's excessive force claim. Therefore, at issue are Plaintiff's excessive force claim against defendants T. Reyna, N. Correa, Bremnar, and Brookwalter; and Plaintiff's claim that defendants Peacock and Tyson failed to protect him.

Defendants T. Reyna, Correa, Bremnar, and Brookwalter argue that they did not violate a constitutional right, because there is no evidence that they used excessive force against Plaintiff, and they acted reasonably under the circumstances of the escort. Defendants argue that they acted sparingly and reasonably to escort Plaintiff to the holding cell, to pick Plaintiff up from his holding cell after he was medically evaluated, and to carry him to his cell when he refused to obey an order to walk. Defendants argue that because Plaintiff disregarded Sergeant Brookwalter's order to stand up, and Plaintiff needed to be moved from the holding cell to his cell, it was reasonable to carry him there when he would not walk on his own. Because the escort was reasonable, Defendants argue that defendant Tyson had no need to intervene to stop use of excessive force.

The Court has found that genuine disputed facts remain for trial on Plaintiff's excessive force claims and failure to protect claims. When taken in the light most favorable to Plaintiff, the facts demonstrate that Defendant's actions violated Plaintiff's rights to be protected and to

34

be free from excessive force.

The incident at issue in Plaintiff's complaint allegedly occurred in January 2006.  The law was clearly established at that time that an officer may not use excessive force against an inmate.  The law concerning Eighth Amendment protections against excessive force was established in Whitley, 475 U.S. at 320-32 (factors affecting whether force is excessive include "the need for the application of force, the relationship between the need and the amount of force that was used, [and] the extent of injury inflicted . . .  But equally relevant are such factors as the extent of the threat to the safety of staff and inmates, as reasonably perceived by the responsible officials on the basis of the facts known to them, and any efforts made to temper the severity of a forceful response.") (internal quotation and citation omitted).

It was also clearly established, as early as June 1994, that "prison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners," and that a prison official violates an inmate's Eighth Amendment rights when the prison official exhibits deliberate indifference to the inmate's safety.  Farmer, 511 U.S. at 833-34.  By 1996, the Ninth Circuit had made clear that prison officials have a duty to "take reasonable measures to protect inmates from violence at the hands of other prisoners."  Robinson v. Prunty, 249 F.3d 862, 866 (9th Cir. 2001).  These and other cases had established that the failure of a prison official to respond to a known, credible threat to an inmate's safety constituted a violation of the inmate's Eighth Amendment rights.  See Berg v. Kincheloe, 794 F.2d 457, 460-61 (9th Cir. 1986); Cunningham v. Gates, 229 F.3d 1271, 1289-90 (9th Cir. 2000).

Granting dismissal on the ground of qualified immunity is "improper if, under the plaintiff's version of the facts, and in light of the clearly established law, a reasonable officer could not have believed his conduct was lawful."  Schwenk v. Hartford, 204 F.3d 1187, 1196 (2000).  The Court finds that, at the time of the alleged attacks on Plaintiff, the law was sufficiently clearly established to place a reasonable correctional officer on notice that harming a prisoner without a disciplinary or other permissible purpose violates the Eighth Amendment. The Court also finds that a reasonable officer in the circumstances of defendants Peacock and Tyson would have known that failing to protect an inmate from an unprovoked violent attack

by prison staff, when the officer had occasion to intercede, is unlawful.  Accordingly, the Court finds that Defendants are not entitled to dismissal of the claims against them based on qualified immunity.

## VI.   CONCLUSION AND RECOMMENDATIONS

Based on the foregoing, the Court finds that no genuine issues of material fact remain for trial on Plaintiff's medical claims and defendant Peacock's liability for failure to protect Plaintiff under the Eighth Amendment.   Therefore, Defendants are entitled to summary judgment on these claims.

However, the Court finds disputed questions of fact that preclude summary judgment on Plaintiff's excessive force claims against defendants T. Reyna, Correa, Bremnar, and Brookwalter, and Plaintiff's claims that defendants Peacock and Tyson failed to protect him, in violation of the Eighth Amendment.  The Court also finds that Defendants are not entitled to qualified immunity for these claims pending against them.

Accordingly IT IS HEREBY RECOMMENDED that:

1.      Defendants' motion for summary judgment, filed on June 29, 2012, be GRANTED in part and DENIED in part;

2.      Defendant Peacock be granted summary judgment on Plaintiff's excessive force claims against him;

3.      Defendants Bremnar, Brookwalter, Peacock, Tyson, Aspeitia-Fleming, and Patel be granted summary judgment on Plaintiff's medical claims against them;

4.      Defendants Peacock and Tyson be denied summary judgment on Plaintiff's claims that they failed to protect him;

5.      Defendants T. Reyna, Correa, Bremnar, and Brookwalter be denied summary judgment on Plaintiff's excessive force claims against them; and

6.      Defendants be denied qualified immunity for Plaintiff's claims at issue against them.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l).  **Within thirty**

**(30) days** after being served with these findings and recommendations, any party may file written objections with the court.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within ten days after service of the objections.  The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal. Wilkerson v. Wheeler, 772 F.3d 834, 838-39 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   **January 6, 2016**          /s/ Erica P. Grosjean

UNITED STATES MAGISTRATE JUDGE